IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIE SHERIFF, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| CITY OF PITTSBURGH, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

## COMPLAINT

### I.   Introduction

1.  Plaintiff, Marie Sheriff (Ms. Sheriff), is a 60-year-old resident of the City of Pittsburgh, Allegheny County, Pennsylvania.

2.  Defendant, City of Pittsburgh (City), is a public entity in Allegheny County, Pennsylvania.

3.  Ms. Sheriff had life-threatening lung disease for approximately 6 years and is currently recovering from a double lung transplant that occurred on May 15, 2014.

4.  Ms. Sheriff requires the assistance of her live-in care giver to get ready and walk to or from a vehicle every time that Ms. Sheriff needs to access her community.  The care giver often has to make multiple trips to transport her wheelchair and other medical devices.

5.  It is a difficult and sometimes dangerous task for Ms. Sheriff to access her community or return home because of a lack of accessible, on-street parking near her home.

6.  Ms. Sheriff's safety has been and is being compromised because Ms. Sheriff's care giver must double-park near Ms. Sheriff's home due to a lack of accessible, on-street parking very near Ms. Sheriff's home, or Ms. Sheriff is forced to walk distances to and from parking spaces that place her safety at risk due to her significantly limited abilities to walk and breathe.

7.  City provides on-street residential parking on Ms. Sheriff's street in the neighborhood of South Oakland, just as it does in many, if not all, of its residential neighborhoods.

8.  Under certain circumstance, City designates accessible, on-street parking upon application of a person with disabilities.

9. Providing an accessible, on-street parking spot very near Ms. Sheriff's home would be a reasonable modification to City's on-street parking services and programs that would give Ms. Sheriff an opportunity to meaningfully enjoy the benefits of these services and programs.

9.  Ms. Sheriff's caregiver contacted the City's Department of

Public Works in March or early April of 2014, and requested an accessible parking spot in front of Ms. Sheriff's home due to Ms. Sheriff's physical limitations that result from her disabilities.

10.  Despite being informed of Ms. Sheriff's significant disabilities and need for accessible, on-street parking, City's Department of Public Works refused to allow Ms. Sheriff to even apply for an accessible, on-street parking spot.

11.  Ms. Sheriff brings this action against City for discriminating against her in failing to provide her with an accessible, on-street parking spot in front of her home so that she can have an opportunity to equally participate in and meaningfully enjoy the benefits of City's on-street residential parking services and programs.

12.  Ms. Sheriff seeks declaratory relief, injunctive relief, compensatory damages, and attorney's fees and costs.


II.  **Jurisdiction and Venue**

13.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that these claims are asserted under the laws of the United States and under 28 U.S.C. § 1343(a).

14.  Ms. Sheriff's claims are authorized under 42 U.S.C. §§

3

1983 and 12133, 29 U.S.C. § 794a(a)(2), and 28 U.S.C. §§ 2201 and 2202.

15. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this judicial district and because City is located in this judicial district.

## III.   **Parties**

16. Plaintiff is a resident of the neighborhood of South Oakland, City of Pittsburgh, Pennsylvania, 15213.

17. Defendant is a political subdivision of the Commonwealth of Pennsylvania. The business address of the City of Pittsburgh is 313 City-County Building, 414 Grant Street, Pittsburgh, Pennsylvania, 15219.

## IV.   **Factual Allegations**

18. Ms. Sheriff is a 60-year-old woman with physical disabilities that are related to or caused by her life-threatening battle with lung disease.

19. Fortunately, Ms. Sheriff received a double lung transplant

at the University of Pittsburgh Medical Center-Presbyterian (UPMC) on May 15, 2014.

20.  Despite Ms. Sheriff's double lung transplant, at all relevant times discussed herein, Ms. Sheriff's disabilities substantially affected, and continue to substantially affect, her abilities to walk, breathe, and work.

21.  Ms. Sheriff was first diagnosed with scleroderma in her lungs about 6 years ago.

22.  Scleroderma decimated Ms. Sheriff's lungs and caused her to be placed on a waiting list to receive a double lung transplant at UPMC.

23.  "Scleroderma, or systemic sclerosis, is a chronic connective tissue disease generally classified as one of the autoimmune rheumatic diseases." *Scleroderma Foundation*, http://www.scleroderma.org/site/PageServer?pagename=patients_whatis#.VC74QWddVv8 (*accessed* October 3, 2014).

24.  Before Ms. Sheriff developed scleroderma, Ms. Sheriff led an active life in her community, which included working, shopping, attending church services, and participating in community activities.

25.  Ms. Sheriff's participation in community activities was

eliminated or reduced in virtually all respects because of her disability which significantly limited her abilities to walk, breathe, and work.

26. Prior to the onset of Ms. Sheriff's disability, she worked as an Account Conciliator for PNC Bank.

27. Despite Ms. Sheriff's desire to work, she was eventually forced to quit her job in 2008 due to her disability.

28. However, Ms. Sheriff has been required to access her community more often for medical appointments and hospitalizations, some of which are not regularly scheduled, come with short notice, and cannot be rescheduled due to the necessity of the medical treatments.

29. Ms. Sheriff was found to be permanently disabled pursuant to Social Security Disability guidelines.

30. Ms. Sheriff is currently unable to work due to her disabilities.

31. Ms. Sheriff has significant difficulty walking, and prior to the May 15, 2014 double lung transplant, could only walk a few steps at a time before she had to sit and rest, and only then with the physical support of another person.

32. Ms. Sheriff's disabilities require her to be pushed in a

6

wheelchair if she is walking more than short distances with the physical support of others.

33.  Ms. Sheriff is currently receiving physical rehabilitation to address her walking limitations, and still must be pushed in a wheelchair for distances that she cannot safely walk.

34.  Until Ms. Sheriff's double lung transplant, Ms. Sheriff's disabilities required her to use numerous medical devices in order to breathe, including oxygen tanks, breathing tubes affixed to her nose, and other medical equipment that enabled her to breathe.

35.  The oxygen tanks and other breathing equipment had to be used by Ms. Sheriff anywhere she traveled and at all times, *i.e.*, 24 hours a day, 7 days a week.

36.  Ms. Sheriff's ability to breathe remains significantly limited.

37.  Plaintiff continues to undergo medical treatments and hospitalizations due to her treatment for scleroderma and a double lung transplant.

38.  Ms. Sheriff has been hospitalized four or more separate times since receiving a double lung transplant.  For example, Ms. Sheriff underwent an emergency operation at UPMC on or about September 26, 2014, which resulted in a one week hospitalization.

Ms. Sheriff was again hospitalized at UPMC from December 11 until December 23, 2014, due to pneumonia and other complications arising from her disability and double lung transplant.  Most recently, Ms. Sheriff was hospitalized from January 4 to January 5, 2015.

39.  Ms. Sheriff can only access her community and return home with the assistance of her live-in care giver and adult daughter, Fatu Sheriff (Fatu).

40.  Fatu is employed as a care giver for Loving Kindness, a state-licensed home health care agency.

41.  Fatu received 40 hours of Home Help Aid training to become a certified care giver.

42.  Ms. Sheriff is only able to access her community and return home by using Fatu's assistance and personal vehicle.

43.  Ms. Sheriff does not own a vehicle and does not have a driver's license.

44.  It is an almost impossible task for Ms. Sheriff to leave from or return to her home due to the significant limitations caused by her disabilities and the unavailability of accessible, on-street parking in front of her home.

45.  Accessible, on-street residential parking consists of a pole

8

posted at the edge of a street curb that is very near the residence of an individual with a disability, a sign at the top of the pole providing notice that it is an accessible parking spot that can only be used by or for the exclusive benefit of an individual with a state-issued accessible parking license plate or rear-view mirror hanging placard (both discussed below), and a painted curb that is the length of the accessible parking spot.

46.  Residential on-street parking is provided by the City and available on both sides of the street in front of Ms. Sheriff's home, but none of this parking is designated as accessible and sufficiently close to Ms. Sheriff's home.

47.  There are often no parking spots close enough to Ms. Sheriff's home that can accommodate her very limited abilities to walk and or breathe.

48.  When Fatu must park further away from Ms. Sheriff's home, Ms. Sheriff's safety is jeopardized by navigating the distance between Fatu's car and her home.

49.  In order to reduce the distance that Ms. Sheriff must walk to get to and from her home, Fatu has also been forced to double-park in front of Ms. Sheriff's home when no parking spot was

9

available close enough to Ms. Sheriff's home, placing Ms. Sheriff at further risk.

50.  Ms. Sheriff still attempts to access her community, *e.g.*, going to church services, but it is very difficult due to her disabilities and City's refusal to provide accessible, on-street parking in front of Ms. Sheriff's home.

51.  Ms. Sheriff suffers from stress and humiliation due to her inability to access her community and maintain personal relationships, including but not limited to, not being able to visit her elderly father in a nursing home, attend church services, attend family gatherings, and civic engagements.

52.  Ms. Sheriff needs accessible, on-street parking very near her home in order to enjoy the benefits of residential, on-street parking which City regularly provides to individuals without disabilities.

53.  City is a public entity that provides city-wide, residential on-street parking services and programs.

54.  Many individuals without disabilities enjoy the benefits of City's residential on-street parking services and programs by walking to and from their homes and on-street parking spaces without

10

significant limitations caused by disability.

55.  Ms. Sheriff cannot meaningfully enjoy the benefits of City's on-street parking services near her home because they are not reasonably accessible to and usable by her without causing Ms. Sheriff great difficulty, discomfort, risk to and fear for her safety.

56.  An accessible-designated, on-street parking spot in front of Ms. Sheriff's home would permit Ms. Sheriff to participate in and meaningfully enjoy the benefits of City's on-street parking services and programs.

57.  In March or early April of 2014, Fatu called City's Department of Public Works, informed it of Ms. Sheriff's significant disabilities and limitations, and requested an accessible parking space in front of Ms. Sheriff's home.

58.  Fatu was informed that Ms. Sheriff needed a disabled license plate to get an application.

59.  City's Department of Public Works was also informed by Fatu that Ms. Sheriff did possess a Pennsylvania-issued accessible parking hanging placard, but Fatu was told that it did not matter pursuant to its policy.

60.  City would not permit Ms. Sheriff to apply for an accessible,

11

on-street parking spot near her home due to its policy requiring that an individual with a disability have a car with a disabled parking license plate.

61. Ms. Sheriff mailed a letter to City's ADA Coordinator on or about May 19, 2014, formally requesting an accommodation of Ms. Sheriff's disabilities from City by providing her with an accessible, on-street parking spot directly in front of her home.

62. On July 19, 2014, counsel for City notified Ms. Sheriff's counsel that Ms. Sheriff's request for an accommodation had been denied.

63. City's rationale for denying the requested accommodation was not due to any individualized assessment of Ms. Sheriff's need for the accommodation or other lawful considerations, but rather, was out of its fear that "hundreds" of people with disabilities would come forward to request similar accommodations if Ms. Sheriff were to receive her requested accommodation.

64. City also denied Ms. Sheriff's requested accommodation on account of a City policy.

65. City's counsel could not provide a written copy of City's policy to Ms. Sheriff.

66.  Pursuant to Pennsylvania law, accessible, on-street residential parking spots may be designated as such by local authorities and are to be used exclusively by individuals with disabilities or for the transportation of individuals with disabilities. *See* 75 Pa.C.S.A. § 3354(d), (e), and (f) (imposing regulations for accessible, on-street residential parking and penalties for violating the same).

67.  City's stated policy categorically prohibits persons with disabilities from obtaining, or even applying for an accessible, on-street parking spot pursuant to Pennsylvania law.  *See* 75 Pa.C.S.A. § 1338(a) (imposing requirements for obtaining accessible parking license plate).

68.  Only vehicles that are registered to individuals with disabilities, or vehicles that are to be used exclusively for the use and benefit of an individual with a disability, are eligible for a "Person with disability plate" pursuant to Pennsylvania's law. *Id.*

69.  Pursuant to City's stated policy, obtaining an accessible parking license plate is a prerequisite for even applying for an accessible, on-street parking spot near a residence.

70.  Ms. Sheriff has not owned a vehicle at any time discussed

13

in this Complaint and therefore is not eligible for a Pennsylvania-issued accessible parking license plate.

71.  Pursuant to Pennsylvania law, individuals with disabilities may also obtain a Pennsylvania-issued "Person with disability parking placard" (accessible parking hanging placard) pursuant to 75 Pa.C.S.A. § 1338(b), and may park in parking spots designated as accessible.

72.  Pennsylvanians who obtain accessible parking hanging placards must meet the same disability-based eligibility requirements that are needed to obtain an accessible parking license plate.  75 Pa.C.S.A. § 1338(b) (*citing* 75 Pa.C.S.A. § 1338(a)).

73.  Accessible parking hanging placards must be hung from rearview mirrors or placed on dashboards of vehicles being used for the transportation of qualifying individuals with disabilities.

74.  Ms. Sheriff has had a Pennsylvania-issued accessible parking placard for all relevant times discussed in this Complaint. She informed City of this fact.

75.  Accessible parking license plates are not transferrable between vehicles unless the vehicles are registered to an individual with a disability or are being used exclusively for the benefit of an

14

individual with a disability; accessible parking hanging placards are transferable between vehicles that are transporting an individual with a disability whether or not the vehicle is registered to an individual with a disability.

76. Ms. Sheriff is disabled and eligible for accessible parking pursuant to Pennsylvania law.

77. City was intentionally and deliberately indifferent to the harm that Ms. Sheriff suffered, and continues to suffer, due to its knowledge that it was   repeatedly violating Ms. Sheriff's federally protected rights to be free from discrimination, and its failure to act despite that knowledge.

78. City has known that Ms. Sheriff is a person with a physical disability who needs an accessible-designated, on-street parking space very near her residence.

79. City has been aware since at least May of 2014 that Ms. Sheriff is unable to access her community without great difficulty, discomfort, risk to and fear for her safety due to violations of federal law.

80. City was deliberately indifferent to Ms. Sheriff's need for an accommodation and her federal rights to be free from discrimination

15

when it failed to provide her requested accommodation.

81.  City was aware of Ms. Sheriff's federal rights when it failed to conduct an individualized determination of Plaintiff's need for the requested accommodation.

82.  City continues to be deliberately indifferent to the substantial risk of safety that it causes to Ms. Sheriff by failing to enforce her federal right to be from discrimination.

83.  Ms. Sheriff continues to suffer stress and humiliation due to her inability to access her community and maintain personal relationships, including but not limited to, not being able to visit her elderly father in a nursing home, attend church services, attend family gatherings, and civic engagements.

84.  City's discriminatory conduct and its harm to Ms. Sheriff are ongoing as Plaintiff still has not received her requested accommodation.

## V.  Claims

### A.  Count I:  Defendant's Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

85.  Ms. Sheriff incorporates paragraphs 1-84 by reference as if fully set forth herein.

16

86.  As an individual who has had life-threatening scleroderma, a double lung transplant, and ongoing medical care and hospitalizations, Ms. Sheriff has physical impairments that substantially limit her major life activities of walking, breathing, and working.  Accordingly, Ms. Sheriff has a "disability" within the meaning of Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 705(20)(B).

87.  Ms. Sheriff meets the eligibility requirements to participate in City's residential on-street parking services and programs. Therefore, she is an "otherwise qualified individual with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 794.

88.  City is a recipient of federal financial assistance.  As such, City is subject to the requirements of the Rehabilitation Act.

89.  City has violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by:

a.  excluding Ms. Sheriff from equal participation in its services, programs, and or activities solely by reason of her disability or disabilities;

b.  denying Ms. Sheriff access to its services, programs, and or activities equal to that provided to persons without

17

disabilities solely by reason of her disability or disabilities;

c.  denying Ms. Sheriff the benefits of its services, programs, and or activities solely on the basis of disability;

d.  using criteria and methods of administration that have the purpose and effect of defeating or substantially impairing accomplishment of the objectives of the City's residential on-street parking services and programs with respect to individuals with disabilities, including Ms. Sheriff;

e.  imposing or applying unnecessary eligibility criteria that screen out or tend to screen out individuals with disabilities, including Ms. Sheriff, from fully and equally enjoying the benefits of  City's residential on-street parking services and programs;

f.  refusing to provide Ms. Sheriff with a reasonable accommodation necessary to enable her to have equal access to City's services, programs, and or activities; and

g.  failing to take the necessary and appropriate steps to ensure that Ms. Sheriff is afforded an equal opportunity to meaningfully enjoy the benefits of and participate in City's residential  on-street parking services and programs.

90.  Defendant engaged in these discriminatory actions intentionally or with deliberate indifference to the rights of Plaintiff.

**B.  Count II: Defendant's Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132**

91.  Ms. Sheriff incorporates paragraphs 1-90 by reference as if fully set forth herein.

92.  As an individual who has had life-threatening scleroderma, a double lung transplant, and ongoing medical care and hospitalizations, Ms. Sheriff has physical impairments that substantially limit her major life activities of walking, breathing, and working.  Accordingly, Ms. Sheriff has a "disability" within the meaning of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2)(A).

93.  Ms. Sheriff is eligible to participate in City's residential on-street parking services and programs and is therefore a "qualified person with a disability" within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2).

94.  City is "public entity" within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1)(B).

95.  City has violated Title II of the ADA, 42 U.S.C. § 12132, by:

a.  excluding Ms. Sheriff from the opportunity to participate in or benefit from its services and programs by reason of her disability;

b.  denying Ms. Sheriff the benefits of its services, programs, and activities on the basis of her disability;

c.  using criteria and methods of administration that have the purpose and effect of defeating or substantially impairing accomplishment of the objectives of the City's residential on-street parking services and programs with respect to individuals with disabilities, including Ms. Sheriff;

d.  imposing or applying unnecessary eligibility criteria that screen out or tend to screen out individuals with disabilities, including Ms. Sheriff, from fully and equally enjoying the benefits of  City's residential on-street parking services and programs;

e.  refusing to provide Ms. Sheriff with a reasonable modification necessary to enable her to have equal access to City's services, programs, and activities; and

f.  failing to take the necessary and appropriate steps by providing Ms. Sheriff with an accessible-designated, on-street

20

parking space in front of her home to assure that she has a meaningful and equal opportunity to enjoy the benefits of City's residential, on-street parking services and programs similarly to individuals without disabilities.

96.    City engaged in these discriminatory actions intentionally or with deliberate indifference to the rights of Ms. Sheriff.

## VI.    Relief Requested

97.  Ms. Sheriff respectfully requests that the Court:

a.    retain jurisdiction over this action;

b.    declare that City's discriminatory actions and inactions violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132;

c.    issue appropriate injunctive relief to enjoin City from continuing to violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and Title II of the Americans with Disabilities Act, 42 U.S.C. §12132;

d.    award compensatory damages to Ms. Sheriff for City's violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and Title II of the Americans with Disabilities Act,

42 U.S.C. § 12132;

   e. award Ms. Sheriff's reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. § 1988 and 12205 and 29 U.S.C. § 794a(b); and

   f. issue all other relief as may be just, equitable, and appropriate.


     Respectfully submitted,


Dated: January 14, 2015     *Jeffrey M. Skakalski*

Jeffrey M. Skakalski
Attorney I.D. No. PA 208466
Carol A. Horowitz
Attorney I.D. No. PA 81660
Disability Rights Network of PA
429 Fourth Avenue
Suite 701
Pittsburgh, PA  15219
(412) 258-2131 (voice)
(412) 467-8940 (fax)
jskakalski@drnpa.org
chorowitz@drnpa.org


Attorneys for Plaintiff